# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LIYAH KAPRICE BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-1509 (RMC) |
| | ) | |
| HILDA SHORT, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Liyah Kaprice Brown is a Public Defender in the D.C. Superior Court. During a hearing in Superior Court, the judge became irate and ordered security to take Ms. Brown into custody. Plaintiff sues former U.S. Marshals Service Detention Security Officer ("DSO") Hilda Short, who conducted a partial strip search of Ms. Brown when she took Ms. Brown into custody. During this search, DSO Short allegedly bared Ms. Brown's breasts in sight of a male officer and prisoners in the nearby holding cells. Plaintiff argues that this search violated her Fourth Amendment right to be free from unreasonable searches and seeks monetary damages pursuant to 42 U.S.C. § 1983 and/or *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). DSO Short[1] has filed a motion to dismiss, arguing that she was not acting under color of state law so that Plaintiff's claim under 42 U.S.C. § 1983 fails as a matter of law, and that she is entitled to qualified immunity, shielding her from Plaintiff's *Bivens* claim. Mot. to Dismiss

---

[1] Ms. Short is the only remaining Defendant in this case. The Third Amended Complaint also named the United States as a Defendant, but Plaintiff voluntarily dismissed the United States without prejudice. *See* Notice of Voluntary Dismissal [Dkt. # 29].

[Dkt. # 25]. The motion will be granted in part and denied in part as follows: The Section 1983

claim will be dismissed, but Plaintiff will be permitted to proceed on her constitutional claim under

*Bivens*. Further, DSO Short's motion to dismiss based on qualified immunity will be denied.

## I. FACTS

Ms. Brown is a Public Defender who was taken into custody on August 29, 2007 at

the direction of District of Columbia Superior Court Judge John H. Bayly, Jr.[2] Ms. Brown has been

an attorney with the Public Defender Service for the District of Columbia since 2005. She appears

regularly before judges of the Superior Court.

The United States Marshals Service ("USMS") maintains a cellblock in the lower

levels of the D.C. Superior Court to hold detainees who will appear in the Superior Court or who are

taken into custody in the courthouse. In response to Judge Bayly's order, employees of the USMS

took Ms. Brown into custody. They searched her when she entered the cellblock and then placed her

in a holding cell. This lawsuit arises from that search, which Plaintiff contends was conducted in

a manner that violated her Fourth Amendment right to be free of unreasonable searches.

Plaintiff alleges that DSO Short subjected her to a "pat-down" search and a partial

strip search in the presence of a male USMS Deputy Marshal. Third Am. Compl. ¶¶ 20-22. Both

of the searches took place against the wall across from the holding cells. *Id.* ¶ 21. DSO Short

performed the pat-down while Ms. Brown had her back to the wall. *Id.* ¶ 22. Ms. Brown cooperated

and nothing inappropriate was found; she had passed through a metal detector before entering the

_____

[2] This incident was investigated by the District of Columbia Commission on Judicial
Disabilities and Tenure, which found that Ms. Brown had done nothing to warrant being taken into
custody and that Judge Bayly's order was in violation of the Code of Judicial Conduct. *See* Third
Am. Compl. [Dkt. # 22], Attach. A. Judge Bayly has written a letter of apology to Ms. Brown. *See
id.*, Attach. B.

courthouse and was actively appearing in court as an attorney at the time the court ordered that she be taken into custody. *Id.* ¶¶ 2, 23. DSO Short then required Ms. Brown to face the wall for a second search. *Id.* ¶ 25. During the second search, DSO Short allegedly "raised Brown's suit jacket and her shirt so that Brown's bare skin was exposed." *Id.* "DSO Short then pulled Brown's bra away from her breasts and above her shoulders, fully exposing Brown's breasts." *Id.* During the search, DSO Short allegedly touched Ms. Brown's breasts. *Id.* ¶¶ 25, 44.[3] The male Deputy Marshal was standing next to DSO Short during both of these searches. *Id.* ¶ 20. Both the male Deputy Marshal and DSO Short allegedly had a full view of Ms. Brown's breasts when DSO Short exposed them. *Id.* ¶¶ 25-26. Although Ms. Brown had her back to the male and female holding cells during the second search, she alleges that her breasts were visible from at least certain positions in both of those holding cells. *Id.* ¶ 26. An individual in the male holding cell jeered and made catcalls regarding Ms. Brown's body. *Id.* ¶ 27.

## II. LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim. Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A complaint must be sufficient to "give the defendant fair notice of what the . . . claim is and the grounds upon which

---

[3] DSO Short argues that the Third Amended Complaint does not adequately allege that the partial strip search involved touching. Reply in Supp. of Mot. To Dismiss [Dkt. # 34] ("Reply") at 6-7. This fact would be relevant only to the portion of the *Bell v. Wolfish* analysis that examines the intrusiveness of the search. 441 U.S. 520 (1979); *see infra* Part III(B)(1)(ii). The Court's disposition on the Motion to Dismiss does not turn on whether the search involved touching. As the parties engage in discovery, this allegation may be developed or disproved. *See* Reply at 7 n.2.

it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted) (omission in original). Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* The facts alleged "must be enough to raise a right to relief above the speculative level." *Id.* Rule 8(a) requires an actual showing and not just a blanket assertion of a right to relief. *Id.* at 555 n.3. "[A] complaint needs *some* information about the circumstances giving rise to the claims." *Aktieselskabet Af 21. Nov. 2001 v. Fame Jeans, Inc.*, 525 F.3d 8, 16 n.4 (D.C. Cir. 2008).

In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 570. When a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, then the claim has facial plausibility. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. But a court need not accept as true legal conclusions set forth in a complaint. *Iqbal*, 129 S. Ct. at 1949. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "While legal conclusions can provide

the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 1950.

## III. ANALYSIS

### A. Section 1983 Claim

To prevail in a civil rights action under 42 U.S.C. § 1983, a plaintiff must plead and prove that the defendant, acting under color of state or D.C. law, deprived the plaintiff of a right secured by the Constitution or laws of the United States. *See West v. Atkins*, 487 U.S. 42, 48 (1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986)). Section 1983 states, in relevant part:

> Every person who, under color of any statue, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress. . . .

42 U.S.C. § 1983. A defendant will be found to have acted under color of state law if their alleged illegal action was an exercise of power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West*, 487 U.S. at 49 (internal quotation marks omitted). This inquiry focuses on "whether [the] defendant [is a] state official[] or ha[s] conspired with state officials in committing the alleged illegal acts" and also considers whether the defendant's acts can "be fairly treated as th[ose] of" the District of Columbia, whether the District of Columbia exercised "coercive power" through the defendant, and whether "D.C. officials . . . provide[d] significant encouragement" or "otherwise participated" in the alleged illegal acts.

*Williams v. United States*, 396 F.3d 412, 414-15 (D.C. Cir. 2005). In *Williams v. United States,* the D.C. Circuit found that a Government Printing Office special policeman's arrest of the plaintiff for an alleged violation of D.C. law could not be called D.C. action. Because the policeman was a federal official, "[o]nly the federal government gave him the power to make arrests for violations of D.C. law;" therefore, the District of Columbia had "no authority over him" and D.C. officials did not participate or encourage the arrest. *Id.* at 415.

Section 1983 does not apply to federal officers acting under color of federal law. *See District of Columbia v. Carter*, 409 U.S. 418, 424-25 (1973); *Settles v. United States Parole Comm'n*, 429 F.3d 1098, 1104 (D.C. Cir. 2005); *see also McCord v. Bailey*, 636 F.2d 606, 613 (D.C. Cir. 1980) (noting that "[a]ctions of federal officers are outside [of Section 1983's] proscriptions").

Whether Section 1983 is applicable to DSO Short is a close question that poses complex legal issues. This Court has wrestled with analogous questions concerning the applicability of Section 1983 to former United States Marshal for the Superior Court Todd Dillard and has concluded that the United States Marshal for the Superior Court himself acts under federal, not D.C., law and thus claims cannot be made against him under Section 1983. *Bame v. Dillard*, 647 F. Supp. 2d 43, 50 (D.D.C. 2009) ("Superior Court Marshals act under color of federal law, and thus do not qualify as state actors for purposes of 42 U.S.C. § 1983."); *Johnson v. Gov't of D.C.*, 584 F. Supp. 2d 83, 85, 87-92 (D.D.C. 2008) (holding, based on the history and legal foundations of the District of Columbia court system and the Superior Court Marshal, that "Marshal Dillard was a federal official and not an employee, servant, agent or actor under the control of the District of Columbia"). However, because DSO Short was neither a Deputy Marshal herself nor *the* Marshal for the Superior Court and because both *Bame* and *Johnson v. Government of District of Columbia* involved arrestees

awaiting presentment to a judicial officer, this case raises questions not presented by the facts of either of those prior suits.

Plaintiff seeks to retain her Section 1983 claim by arguing that, although DSO Short was a federal employee and not a D.C. employee, "she was clothed in the authority of the District of Columbia" and therefore acted under color of both state and federal law. *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss [Dkt. # 28] ("Opp'n") at 24, 28. Plaintiff cites *West*, 487 U.S. at 56, in support of this proposition. In *West*, the court held that the defendant, a prison hospital physician, was a state actor for purposes of Section 1983 because he was "fully vested with state authority to fulfill essential aspects" of the State's Eighth Amendment obligation to provide essential medical care to incarcerated individuals. 487 U.S. at 56-57. Plaintiff argues that, despite its federal origins, the Superior Court has always been treated as a state court by the D.C. Circuit and, that, therefore, "[i]n providing security for judicial proceedings" there, DSO Short "exerted the coercive power of the District of Columbia." Opp'n at 25-26; *see also Handy v. Shaw*, 325 F.3d 346, 351 & n.5 (D.C. Cir. 2003) (noting that "both our case law and other federal statutes treat the D.C. courts like state courts").

DSO Short argues that, under *West*, whether DSO Short exercised power "possessed by virtue of state law," 487 U.S. at 49, is a threshold question that must be addressed before the Court considers whether she was "clothed with state authority." Reply at 3; *West*, 487 U.S. at 49. Because her power derived exclusively from federal law, DSO Short argues that she was not a state actor under Section 1983 regardless of whether she was "clothed with state authority." Reply at 2-3; *West*, 487 U.S. at 49.

The Court finds that at the time DSO Short searched Ms. Brown, she was not acting

at the behest of a Superior Court judge or carrying out her courtroom duties.  Therefore, to the extent that the Superior Court can be described as a "state" court, DSO Short was not exercising power derived from state law and she was not clothed with that authority.  DSO Short was following U.S. Marshal policy without regard to the order of a judicial officer.  In this position, she was a federal actor analogous to the U.S. Marshall for the Superior Court, to whom Section 1983 does not apply. *Bame*, 647 F. Supp. 2d at 50; *Johnson v. Gov't of D.C.*, 584 F. Supp. 2d at 85.

Because DSO Short was not a state actor who can be sued under Section 1983, DSO Short's motion to dismiss the Section 1983 claim will be granted.  However, Plaintiff may be able to assert her Fourth Amendment claim against DSO Short pursuant to *Bivens*, under which a Fourth Amendment violation by a federal agent acting under color of his authority can give rise to a cause of action for damages.  403 U.S. at 389.

### B.  Qualified Immunity

Plaintiff may proceed with her claims against DSO Short under *Bivens* unless DSO Short is protected by qualified immunity.  Qualified immunity "shields government officials from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Farmer v. Moritsugu*, 163 F.3d 610, 613 (D.C. Cir. 1998) (per curiam) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The qualified immunity doctrine "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

In adjudicating a defense of qualified immunity, courts conduct a two-part inquiry which asks whether, "taken in the light most favorable to the party asserting the injury," "the facts

alleged show the [actor]'s conduct violated a constitutional right," *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, 129 S. Ct. 808, 822-23 (2009), and assesses the "objective legal reasonableness" of the defendant's conduct "as measured by reference to clearly established law." *Harlow*, 457 U.S. at 818; *see also Johnson v. District of Columbia*, 528 F.3d 969, 973 (D.C. Cir. 2008) (applying *Saucier* test). The sequence of this two-step protocol is no longer mandatory. *Pearson*, 129 S. Ct. at 818, 822-23 (courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first" in a given case). This analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam).

### 1. *Plaintiff Has Asserted a Violation of the Fourth Amendment*

The Fourth Amendment to the United States Constitution protects the people from unreasonable searches and seizures. It reads:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Plaintiff alleges that DSO Short violated her Fourth Amendment rights when she conducted the partial strip search described in the Third Amended Complaint. Third Am. Compl. ¶¶ 20-26. DSO Short denies that any strip search, partial or otherwise, was conducted upon Ms. Brown's entry into the cellblock; nonetheless, DSO Short recognizes that the Court will assume the truth of the allegations in the Third Amended Complaint for purposes of ruling on her motion to dismiss. Mot. to Dismiss at 6. She argues that the alleged search did not violate the Fourth Amendment and was, instead, "a lawful and reasonable means of protecting the security of the

-9-

Superior Court cellblock and the courthouse." *Id.*

Ms. Brown was about to be placed in a holding cell. Reducing the incidence of contraband and weapons in such a setting is a legitimate and well-recognized interest of penal institutions. *Bell*, 441 U.S. at 546 (emphasizing that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees"). Because of the importance of institutional security, officials are accorded "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed" to achieve and maintain order. *Id.* at 521. Because DSO Short was charged with maintaining the internal security of the holding cell, a general search of Ms. Brown before placing her in the holding cell was constitutionally permissible.

The question here is whether the partial strip search of Ms. Brown, an attorney ordered into custody in the midst of a court proceeding, was reasonable under the *Bell* test. The *Bell* test requires courts to balance the "need for the particular search against the invasion of personal rights that the search entails." *Id.* at 559. "*Bell* has not been read as holding that the security interests of a detention facility will always outweigh the privacy interests of the detainees." *Dobrowolskyj v. Jefferson County, Ky.,* 823 F.2d 955, 957 (6th Cir. 1987). In assessing the balance, courts must consider "the scope of the particular intrusion, the manner in which it is conducted, the justifications for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559.

Applying the *Bell* factors to the facts of this case as stated in the complaint, it becomes clear that DSO Short's search, as alleged in the Third Amended Complaint, was unreasonable and violated Ms. Brown's Fourth Amendment right to be free from unreasonable

searches.

### i. The Justifications for Initiating the Intrusion

Whether the search was justified is the "most important factor" in the *Bell* analysis. *Bame*, 647 F. Supp. 2d at 51. Plaintiff argues that a law enforcement officer must have particularized reasonable suspicion that the object of a strip search has contraband on her person; DSO Short disagrees. Opp'n at 7-9; Reply at 5-6 ("The D.C. Circuit has not addressed the Fourth Amendment implications of partial or complete strip searches conducted in correctional facilities, making *Bell* the only binding precedent. Thus Ms. Brown's assertion that the Court can skip the *Bell* analysis, and simply adopt a *per se* rule that any (partial or complete) 'strip search' is unconstitutional absent individualized suspicion, is incorrect."). Notably, DSO Short cites no law. Her most curious argument misperceives the Court's authority. Without precedent in this Circuit *refusing* to find that any strip search is unconstitutional without individualized suspicion, the Court is perfectly free to be persuaded by precedent in other jurisdictions or the force of a party's arguments alone.

Until 2008, every federal circuit court to have faced the issue ruled that, to be found constitutional under *Bell*, strip searches of pre-trial arrestees charged with minor offenses must be justified by at least reasonable suspicion that the arrestee is hiding weapons or contraband. *See Bame*, 647 F. Supp. 2d at 51 (citing cases); *see also Edgerly v. City and County of San Francisco*, 599 F.3d 946, 957 (9th Cir. 2010); *Serna v. Goodno*, 567 F.3d 944, 951 (8th Cir. 2009) ("[T]he facts and holding of *Bell* illustrate that some unarticulated level of individualized suspicion was present and that the Court necessarily considered this fact in its application of the balancing test."), *cert. denied*, 130 S. Ct. 465 (2009); *N.G. v. Connecticut*, 382 F.3d 225, 232 (2d Cir. 2004); *Swain v.*

*Spinney*, 117 F.3d 1, 7 (1st Cir. 1997); *Kelly v. Foti*, 77 F.3d 819, 821 (5th Cir. 1996); *Chapman v. Nichols*, 989 F.2d 393, 395 (10th Cir. 1993) (holding unconstitutional strip searches of arrestees charged with minor traffic violations); *Masters v. Crouch*, 872 F.2d 1248, 1253 (6th Cir. 1989) ("We have found no authority approving a practice of conducting a strip search of a person arrested for a simple traffic violation in the absence of at least reasonable suspicion. . . ."); *Logan v. Shealy*, 660 F.2d 1007, 1013-14 (4th Cir. 1981) (holding unconstitutional a strip search of an arrestee charged with driving while intoxicated where probable cause was lacking); *Tinetti v. Wittke*, 620 F.2d 160, 160 (7th Cir. 1980) (per curiam) (holding unconstitutional strip searches of arrestees charged with minor traffic offenses without probable cause); *see also United States v. Scott*, 987 A.2d 1180, 1194 (D.C. 2010) ("particularized justification must exist for a strip search of an arrestee to be deemed reasonable under the Fourth Amendment").  In 2008, the Eleventh Circuit held that *Bell* does not require individualized suspicion for strip searches.  *Powell v. Barrett*, 541 F.3d 1298, 1306-07 (11th Cir. 2008) (en banc).  The Eleventh Circuit remains an outlier on the interpretation of *Bell* with respect to individualized suspicion.

The federal circuit courts are slightly more divided on the question whether the Fourth Amendment requires individualized suspicion to justify a strip search of an arrestee charged with a minor offense who is to be intermingled with the general prison population.  The Ninth Circuit recently held that, where an arrestee is to be intermingled with the general prison population, the heightened institutional security concerns shift the balance of interests such that individualized suspicion is not constitutionally necessary.  *Edgerly*, 599 F.3d at 957 (citing *Bull v. City and County of San Francisco*, 595 F.3d 964, 977 (9th Cir. 2010) (en banc)); *see also Bame*, 647 F. Supp. 2d at 51 (emphasizing, in finding that the strip searches at issue were constitutional, that arrestees were

not going to be placed in the general prison population).  Similarly, in *Powell*, where the Eleventh Circuit held that individualized suspicion is *never* constitutionally necessary under *Bell*, the Court emphasized that the plaintiffs were strip searched "solely because they were entering the general population of inmates at the detention facility."  *Powell*, 541 F.3d at 1300.  On the other hand, the majority of the federal circuit courts that have considered this issue have rejected the argument that intermingling negates the constitutional necessity of individualized suspicion.  *See, e.g.*, *Savard v. Rhode Island*, 338 F.3d 23, 37 (1st Cir. 2003) (en banc) ("It is not commingling, *per se*, that presents a security problem; it is commingling that involves a risk of illegal traffic among the commingled inmates."); *Masters*, 872 F.2d at 1254 ("[T]he fact of intermingling alone has never been found to justify [a strip] search without consideration of the nature of the offense and . . . whether there is any reasonable basis for concern that the particular detainee will attempt to introduce weapons or other contraband into the institution."); *Walsh v. Franco*, 849 F.2d 66, 69 (2d Cir. 1988) (rejecting the argument that a blanket strip search policy for all misdemeanor arrestees was constitutional because they were to be intermingled with arraigned inmates); *Hill v. Bogans*, 735 F.2d 391, 394 (10th Cir. 1984) (intermingling is only one factor to be considered); *see also Warner v. Grand County*, 57 F.3d 962, 964 (10th Cir. 1995) ("a brief intermingling with the general jail population does not justify a strip search absent reasonable suspicion of drugs or contraband").

Ultimately, the *Bell* balancing test "is not capable of precise definition or mechanical application," but must examine the specific circumstances of the search in question to determine whether that search was conducted in a "reasonable manner."  *Bell*, 441 U.S. at 560.  *Bell*'s case-specific balancing test would be inconsistent with a *per se* rule regarding whether the Fourth Amendment requires individualized suspicion for certain classes of arrestees.  *See, e.g., Schmidt v.*

*City of Bella Villa*, 557 F.3d 564, 572 (8th Cir. 2009) ("[r]ather than triggering a *per se* rule, [a partial strip search] requires balancing the factors set out in *Bell*"); *United States v. Williams*, 477 F.3d 974, 977 (8th Cir. 2007) (noting, with regard to on-street searches, that "a *per se* rule strikes [the court] as inconsistent with the balancing approach of [*Bell*]").  Certainly, whether a detainee is to be placed in the general prison population and whether the search was justified by individualized suspicion are the two most important factors to be considered in determining whether a search was justified under *Bell*.  *See, e.g.*, *Archuleta v. Wagner*, 523 F.3d 1278, 1284 (10th Cir. 2008) (noting that these two factors are the "primary concerns in determining whether a strip search is reasonable").  However, because of the requisite case-specific considerations that *Bell*'s balancing test entails, 441 U.S. at 559, neither of these factors is necessarily dispositive.  *See, e.g.*, *Hill*, 735 F.2d at 394 ("[I]ntermingling is only one factor to consider in judging the constitutionality of a strip search.").

Individualized suspicion was clearly absent in Ms. Brown's case.  Ms. Brown was not arrested for a criminal violation; she was taken into custody for alleged civil contempt proceedings, and her detention was later determined to be unwarranted.[4]  *See* Third Am. Compl., Attach. B; *see also Shroff v. Spellman*, 604 F.3d 1179, 1191 (10th Cir. 2010) (noting, in holding search unconstitutional, that as the plaintiff was arrested "without probable cause," "but for the unlawful seizure of her person by [defendant], [plaintiff] would not have been subjected to an invasion of her personal right not to be required to expose her breasts before another person").

---

[4] While this point is relevant to the merits of the constitutional question, it is immaterial with regard to the second part of the qualified immunity inquiry, as DSO Short could not have anticipated that Judge Bayly's order that Ms. Brown be taken into custody would later be determined to be unwarranted.  *See* Mot. to Dismiss at 17 n.6.

Further, Ms. Brown is an attorney who appears regularly before judges of the Superior Court and wears a badge identifying herself as such.  Third Am. Compl ¶ 15.  Indeed, Ms. Brown had passed through a metal detector on her way into the courthouse.  *See Id.*

The heightened institutional security concerns arising from the fact that Ms. Brown was placed in a holding cell weighs against the lack of individualized suspicion.  However, in light of the consensus among the majority of federal circuit courts that strip searches of arrestees charged with minor offenses are unjustified under *Bell*, even where the arrestee is to be intermingled with the general prison population, the institutional security interests do not tip the scales.  *See, e.g.*, *Masters*, 872 F.2d at 1254; *Walsh*, 849 F.2d at 69; *Hill*, 735 F.2d at 394.  Thus, the first *Bell* factor — the justifications for initiating the intrusion — weighs in Plaintiff's favor.

### ii.  The Scope and Circumstances of the Intrusion

The remaining *Bell* factors, which examine the scope and circumstances of the intrusion, also weigh in favor of Plaintiff.  Plaintiff argues that the search of Ms. Brown constituted a "strip search."  *See* Opp'n at 5-7.  As the D.C. Circuit has recognized, the balancing inquiry set forth in *Bell* "remains the same regardless of how one characterizes the search."  *BNSF Ry. Co. v. Dep't of Transp.*, 566 F.3d 200, 208 (D.C. Cir. 2003); *see also Stanley v. Henson*, 337 F.3d 961, 964 (7th Cir. 2003) ("Whether we . . . label the process a 'strip search' or merely a 'search' is unimportant, as the analysis remains the same."); *Foster*, 675 F. Supp. 2d at 992 ("the result of neither case turns on the terminology employed").  Therefore, it is not necessary to draw a line between a mere search and a strip search for purposes of determining the legal standards to apply.  However, whether the search constitutes a strip search as defined in other contexts is relevant to the consideration of which cases from other jurisdictions are to be regarded as factually comparable to

the instant case.

The Supreme Court has not specifically set forth the definition of a strip search. *See Safford Unified Sch. Dist. No. 1 v. Redding*, 129 S. Ct. 2633, 2641 (2009) ("we would not define strip search . . . in a way that would guarantee litigation about who was looking and how much was seen"). Fifteen states have statutorily defined strip searches in broad terms that include a visual inspection of underclothing or breasts. CAL. PENAL CODE § 4030© (West 2009); COLO. REV. STAT. ANN. § 16-3-405(2) (West 2009); CONN. GEN. STAT. ANN. § 54-33k (West 2009); FLA. STAT. ANN. § 901.211(1) (West 2009); 725 ILL. COMP. STAT. 5/103-1(d) (West 2009); IOWA CODE ANN. § 702.23 (West 2009); KAN. STAT. ANN. § 22-2520(a) (2008); MICH. COMP. LAWS. ANN. § 764.25a(1) (West 2009); MO. ANN. STAT. § 544.193(1)(2) (West 2009); N.J. STAT. ANN. § 2A:161A-3(a) (West 2009); OHIO REV. CODE ANN. § 2933.32(A)(2) (West 2009); TENN. CODE. ANN. § 40-7-119(a) (West 2009); VA. CODE ANN. § 19.2-59.1(F) (West 2009); WASH. REV. CODE ANN. § 10.79.070(1) (West 2009); WIS. STAT. ANN. § 968.255(1)(b) (West 2009). Several courts have adopted similarly broad definitions of a strip search. *See, e.g.*, *Wood v. Hancock County Sheriff's Dep't*, 354 F.3d 57, 62, 70 (1st Cir. 2003) (holding that jury instructions defining a strip search as "a deliberate, visual inspection of the naked body of a prisoner which includes the examination of the mouth and armpits" provided an "overly narrow" definition warranting a new trial); *Amaechi v. West*, 237 F.3d 356, 365 (4th Cir. 2001) (defining a strip search as "having an arrested person remove or arrange some or all of his clothing so as to permit a *visual inspection* of the genitals, buttocks, anus, female breasts, or undergarments"); *Foster v. City of Oakland*, 675 F Supp. 2d 992, 1003 (N.D. Cal. 2009) ("there is no reason for this court to conclude that a visual inspection of [arrestee]'s underwear was not a 'strip search'"); *Scott*, 987 A.2d at 1193-94 (defining

a strip search as "having a prisoner remove or arrange his/her clothing to allow a visual inspection of the genitals, buttocks, anus, breasts, and undergarments"); *State v. Nieves,* 861 A.2d 62, 70 (Md. 2004) ("strip searches involve the removal of the arrestee's clothing for inspection of the under clothes and/or body"); *People v. Hall*, 886 N.E.2d 162, 165 (N.Y. 2008) (defining strip search as "requir[ing] the arrestee to disrobe so that a police officer can visually inspect the person's body"), *cert. denied*, 129 S. Ct. 159 (2008). Under these definitions, DSO Short's search of Ms. Brown constituted at least a partial strip search.

As DSO Short points out, strip searches and body cavity searches more intrusive than the search at issue here have been held constitutional. *See* Mot. to Dismiss at 9. However, the intrusiveness of the search, like the other *Bell* factors, must "focus on the specific facts and circumstances at hand, not on the facts other courts have faced." *Bame*, 647 F. Supp. 2d at 54. With the exception of *Powell*, 541 F.3d at 1307, where the court held that *Bell* does not require individualized suspicion, the cases cited by DSO Short on this point involved searches for which some specific justification existed beyond general institutional security concerns. *See Serna*, 567 F.3d at 946 (plaintiff, having been determined to be sexually dangerous, was civilly committed); *Stanley*, 337 F.3d at 962 (plaintiff was arrested for misdemeanor battery on a police officer); *Kelsey v. County of Schoharie*, 567 F.3d 54, 56 (2d Cir. 2009) (clothing exchange requirement applied only to inmates not expected to make bail). Where, as here, there was no individualized suspicion, even a relatively minimal intrusion may be unreasonable under *Bell*. *See, e.g.*, *Shroff*, 604 F.3d at 1191 (holding that officer's order that a female cadet be present while plaintiff used a breast pump, which required plaintiff to "expose her breasts in the presence of another person" without justification, constituted an unreasonable search under *Bell*).

The location of the search — within view of the male and female holding cells and in the presence of a male deputy marshal — also supports Plaintiff's position. Courts across the country are "uniform in their condemnation of intrusive searches performed in public." *Campbell v. Miller*, 499 F.3d 711, 719 (7th Cir. 2007); *United States v. Williams*, 477 F.3d at 977 (emphasizing that police officers should "take precautions to insure that a detainee's privacy is protected from exposure to others unconnected to the search"); *Amaechi*, 237 F.3d at 364 ("[W]e have repeatedly emphasized the necessity of conducting a strip search in private."); *United States v. Ashley*, 37 F.3d 678, 682 (D.C. Cir. 1994) (noting, in holding a search constitutional, that "precautions were taken to insure that [the arrestee] was not subjected to public embarrassment"); *Hill*, 735 F.2d at 395 (holding unconstitutional "routine strip searches in a public area of persons detained for minor traffic offenses"); *Iskander v. Village of Forest Park*, 690 F.2d 126, 129 (7th Cir. 1982) ("Defendant naturally does not maintain that routine strip searches may be conducted in a room open to the prying eyes of passing strangers consistent with the reasonableness requirement on all searches under the Fourth Amendment, nor would such a contention be entertained."); *United States v. Ford*, 232 F. Supp. 2d 625, 630 (E.D. Va. 2002) (finding that a roadside search that "exposed the defendant's buttocks on the side of a public highway in broad daylight" violated the Fourth Amendment); *People v. Mitchell*, 2 A.D.3d 145, 148 (N.Y. App. Div. 2003) ("a strip search, conducted in a *public place* . . . is not justified or reasonable absent the most compelling circumstances . . . that pose potentially serious risks to the arresting officer or others in the vicinity); *see also Logan*, 660 F.2d at 1013-14 (holding unconstitutional a strip search carried out "in an area [of the police station] exposed to public view").

As DSO Short correctly points out, the Fourth Amendment does not require searches

to be conducted in complete privacy, and "'prisoners' legitimate expectations of bodily privacy from persons of the opposite sex are extremely limited.'" Mot. to Dismiss at 11 (quoting *Byrd v. Maricopa Sheriff's Dep't*, 565 F.3d 1205, 1222 (9th Cir.), *reh'g granted*, 583 F.3d 673 (9th Cir. 2009)). Further, it is well-established that the Fourth Amendment does not require employing the least intrusive means possible. *Bd. of Educ. of Independent Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 837 (2002). However, whether the official carrying out a search "take[s] steps *commensurate with the circumstances* to diminish the potential invasion of [the detainee's] privacy" is a factor to be considered in the *Bell* analysis. *United States v. Williams*, 477 F.3d at 977 (emphasis added). DSO Short took no such steps in conducting a partial strip search of Ms. Brown in the presence of a male deputy Marshal and in view of the male and female holding cells.

Based on the facts alleged in the complaint, the lack of justification for the search, together with its scope and circumstances, show that DSO Short's conduct fails to satisfy *Bell*'s reasonableness test and, thus, violated Plaintiff's Fourth Amendment right to be free from unreasonable searches. *See Saucier*, 533 U.S. at 201.

### 2. *DSO Short's Conduct Was Not Objectively Reasonable in Light of Clearly Established Law*

The second step of the qualified immunity inquiry requires courts to examine whether the defendant's conduct was objectively reasonable in light of clearly established law. *Harlow*, 457 U.S. at 819. This step asks whether it would be "clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The court looks to cases from the Supreme Court, the D.C. Circuit Court of Appeals, and other courts for principles "exhibiting a consensus view." *Johnson v. District of Columbia*, 528 F.3d at 976. Such precedent need not

involve "materially similar facts" as long as "'the state of the law [at the time of the incident] gave [the official] fair warning that [her alleged misconduct] . . . was unconstitutional.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). The Supreme Court recently reaffirmed this standard, holding that even in novel factual circumstance, "'officials can still be on notice that their conduct violates established law'" although that conduct might be "less than an outrage." *Redding*, 129 S. Ct. at 2643-44 (quoting *Hope*, 536 U.S. at 741). Although the D.C. Circuit Court of Appeals has not ruled on this precise issue, officials may rely on out-of-circuit cases in their good-faith efforts to comply with the law. *Pearson*, 129 S. Ct. at 823; *see also Bame*, 647 F. Supp. 2d at 53-54. The opinions of the D.C. Court of Appeals, which recently considered this issue, *Scott*, 987 A.2d at 1194, also bears on the analysis.

It was not objectively reasonable for DSO Short to believe that it would be lawful to conduct a partial strip search of Ms. Brown under the circumstances described in the Third Amended Complaint. *Bell* itself requires, at a minimum, some balancing of the governmental justification versus the intrusion of the search upon the individual. 441 U.S. at 559. On August, 29, 2007, the date of DSO Short's search, the federal circuit courts to have addressed the issue had unanimously held that, absent individualized suspicion, strip searches of detainees charged with minor offenses were unreasonable under *Bell*. *See Bame*, 647 F. Supp. 2d at 51 ("Until 2008, every federal circuit court to have faced the issue (ten out of twelve) ruled that, under *Bell*, suspicionless strip searches of pre-trial arrestees charged with non-violent, non-drug crimes was unreasonable and thus unconstitutional."). The cases that DSO Short cites in support of her proposition that individualized reasonable suspicion is not the consensus view were decided after the search at issue in this case. *Serna*, 567 F.3d 944 (decided in 2009); *Powell*, 541 F.3d 1298 (decided in 2008). DSO Short

suggests that, at the time of the search, the Eleventh Circuit had begun to "doubt[] the correctness of its precedent" requiring reasonable suspicion for strip searches of arrestees charged with minor offenses by 2007. Mot. to Dismiss at 16. Any such doubt would not be sufficient to undermine the "consensus view" exhibited by the federal circuit courts at that time. *See Johnson v. District of Columbia*, 528 F.3d at 976. Further, the D.C. Court of Appeals' recently held that "particularized justification must exist for a strip search of an arrestee to be deemed reasonable under the Fourth Amendment." *Scott*, 987 A.2d at 1194. Although *Scott* was decided in 2010 and thus does not bear on the state of the law at the time of the incident at issue in this case, it undermines the proposition that courts in the District of Columbia doubted the correctness of the consensus view.

The disagreement among the federal circuit courts regarding a possible exception to this general rule where the arrestee is to be intermingled with the general prison population did not emerge until after the search at issue here. *See Bull*, 595 F.3d at 977 (decided in 2010); *Powell*, 541 F.3d at 1300 (decided in 2008). In 2003, the First Circuit observed that the relevant precedent "would not permit a reasonable prison official to conclude that minor offense arrestees could be strip searched without reasonable suspicion simply because the prison officials decide to mix the arrestees with other prisoners." *Savard*, 338 F.3d at 37.

Further, it is well-established that whether a searching party has taken reasonable efforts to protect the privacy of the party being searched is an important factor in determining the reasonableness and constitutionality of a strip search. *See, e.g.*, *Campbell*, 499 F.3d at 719; *United States v. Williams*, 477 F.3d at 977; *Amaechi*, 237 F.3d at 364; *Ashley*, 37 F.3d at 682; *Hill*, 735 F.2d at 394; *Iskander*, 690 F.2d at 129. As the Fourth Circuit observed in 1981, "no [official] could reasonably believe that conducting a strip search in an area exposed to the general view of persons

known to be in the vicinity whether or not any actually viewed the search [would be] a constitutionally valid governmental invasion of [the] personal rights that [such a] search entails." *Logan,* 660 F.2d at 1013-14 (internal quotation marks omitted).

Therefore, at the time of the search at issue, the law was clearly established that strip searches of arrestees charged with minor offenses would, absent individualized suspicion, be held unreasonable under *Bell* even where the arrestee was to be intermingled with the general prison population and especially where the official conducting the search did not take reasonable efforts to protect the privacy of the party being searched. Thus, it should have been "clear to a reasonable [official]" that a partial strip search of Ms. Brown, a detainee charged only with civil contempt, without individualized suspicion, and without regard to her privacy, would be considered unreasonable under *Bell. See Saucier*, 533 U.S. at 202.

## IV. CONCLUSION

For the reasons explained above, DSO Short's Motion to Dismiss [Dkt. # 25] will be granted in part and denied in part as follows: The Section 1983 claim will be dismissed, but Plaintiff will be permitted to proceed on her constitutional claim under *Bivens*, 403 U.S. 388. Further, DSO Short's motion to dismiss based on qualified immunity will be denied. A memorializing Order accompanies this Memorandum Opinion.


Date: July 30, 2010                    _____/s/_____
                                       ROSEMARY M. COLLYER
                                       United States District Judge